IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

MARCH 1997 SESSION

FILED

June 6, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| EDMUND GEORGE ZAGORSKI, | ) | C.C.A. No. 01C01-9609-CC-00397 |
| | ) | |
| Appellant, | ) | ROBERTSON COUNTY |
| | ) | |
| VS | ) | HON. JANE W. WHEATCRAFT, |
| | ) | JUDGE |
| STATE OF TENNESSEE, | ) | |
| | ) | (Post-Conviction - Death Penalty) |
| Appellee. | ) | |

FOR THE APPELLANT:

**SAMUEL L. FELKER**
**JOSEPH F. WELBORN, III**
2700 First American Center
Nashville, TN 37238-2700

FOR THE APPELLEE:

**CHARLES W. BURSON**
Attorney General and Reporter

**AMY L. TARKINGTON**
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

**GLENN R. PRUDEN**
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

**LAWRENCE RAY WHITLEY**
District Attorney General

**DEE DAVID GAY**
Assistant District Attorney General
202 McClellan Building
Gallatin, TN 37066

**OPINION FILED:** _____

**AFFIRMED**

**JOE G. RILEY,**
**JUDGE**

**O P I N I O N**

Petitioner, Edmund George Zagorski, appeals from the dismissal of his post-conviction relief petition. He was previously convicted of two (2) counts of first degree murder and sentenced to death by electrocution. Zagorski contends the trial court erred in dismissing his petition for post-conviction relief and presents to this Court the following issues for review:

> (1) whether the jury charge on the "heinous, atrocious or cruel" aggravating circumstance was unconstitutional;
>
> (2) whether he received effective assistance of counsel regarding the motion to suppress his statements;
>
> (3) whether he received effective assistance of counsel due to the failure of counsel to present mitigating evidence at his sentencing hearing;
>
> (4) whether the trial court's denial of certain expert services and the failure of trial counsel to request other expert services violated his constitutional rights; and
>
> (5) whether the state withheld exculpatory evidence from trial counsel.

Finding that the petition for post-conviction relief was properly dismissed, we AFFIRM the judgment of the trial court.

## PROCEDURAL HISTORY

In 1984, petitioner was convicted by a jury in Robertson County of two (2) counts of premeditated first degree murder. He was sentenced in both cases to death by electrocution. His convictions and sentences were affirmed on direct appeal by the Tennessee Supreme Court. State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985). His petition for writ of certiorari to the United States Supreme Court was denied on June 30, 1986.

Petitioner's original petition for post-conviction relief was filed in 1987. An amended petition was filed in 1989. The actual hearing on the petition for post-conviction relief was in November 1995 and January 1996.[1] The petition was dismissed by order entered April 19, 1996. Notice of appeal was timely filed, and the

---

[1]The reason for the long delay between the filing of the petition and the actual hearing is not apparent from the record.

case was orally argued in this Court on March 19, 1997.

## FACTS

It is appropriate to recite the facts as set forth by the Tennessee Supreme Court on direct appeal:

> The evidence shows that on April 5, 1983, the defendant first appeared at the Lakeland Trout farm in Bucksnort in Hickman County, Tennessee. The Trout Farm was managed by defendant's friend, Jimmy Blackwell. The defendant, calling himself "Jesse Lee Hardin," claimed to have been working as a mercenary in Honduras and El Salvador. He was wearing camouflage clothing and was carrying a survival knife, an HK 91 .308 semi-automatic rifle and other weapons and survival gear. Although he claimed to have made as much as $100.00 a day as a mercenary, defendant did not seem to have any money.

> During his stay at the trout farm, defendant met John Dale Dotson and his wife Marsha. Dotson and defendant arranged a marijuana purchase involving them and a third man, Jimmy Porter, who lived in nearby Dickson, Tennessee. According to Marsha Dotson, Porter was to pay $23,000.00 for one hundred pounds of marijuana defendant would arrange to have dropped from an airplane into the woods. Dotson was to receive $10,000.00 from Porter for his part of the deal. (Zagorski in a statement to investigating officers stated that the sale was to be of 200 pounds of marijuana at $150.00 per pound). The date of the transaction was to be April 23, 1983.

> At about midnight, on April 21, 1983, an airplane flew very low over the Trout Farm. Zagorski, who was with Blackwell, commented "It's here," and left. Zagorski later told Dotson the marijuana had arrived and was in the woods with a man called Dave; that Dotson and no more than two other men were to meet Zagorski, who would be on foot, at 6:00 p.m. at Spot, Tennessee, which was within walking distance of the Trout Farm. Zagorski also told Dotson to come armed.

> On the afternoon of April 23, 1983, Porter and Dotson were together at the Eastside Tavern in Dickson, Tennessee. There Porter showed the tavern operator a bank bag containing cash and a .357 Magnum pistol. Dotson and Porter left the tavern in Porter's red Datsun pick-up at about 4:30 p.m. They were never seen alive again.

> Also on April 23, 1983, Zagorski left the trout farm, taking his gear. He had been heard to tell Dotson that he would meet him at 6:00 p.m. on the road "up behind Spot." At around 5:30 p.m., Blackwell and his girlfriend heard gunshots from the general area where the defendant had walked into the woods. According to Blackwell, it was not unusual to hear gunshots on a daily basis in that part of Hickman County because of the frequency of deer hunting in the area.

> On May 6, 1983, the badly decomposed bodies of Porter and Dotson were discovered in a secluded, wooded area near I-65 in Robertson County. The men had been shot in the chest and abdomen and their throats had been cut.

3

A search of the area turned up a military snake-bite kit, a knife scabbard (later identified as Zagorski's), a case for "Red Specs" glasses (the type worn by Zagorski), six flares, three size "C" Duracel flashlight batteries and an ink pen. Officers also found a .308 cartridge on the ground between the bodies of the victims. Ballistic tests showed that the cartridge had been fired from Zagorski's HK 91 semi-automatic rifle.

An autopsy was performed on the bodies of the victims, but due to the advanced stage of decomposition, the time of death of the victims could not be fixed with any degree of certitude. The pathologist stated that the time of death could be any time from a week to a month prior to the time the autopsies were performed. The pathologist also testified that he could not determine whether the victims were shot or cut first, but that the actual cause of death of each of the victims was the gunshot wounds. According to the pathologist, neither Porter nor Dotson would have died immediately upon being shot, but they would have lived five to seven minutes. The record further shows that at the time of death, Porter had a blood alcohol level of .10 and Dotson had a blood alcohol level of .25.

Johnny Baggett, who found the bodies, testified that a week to ten days before at around 7:00 or 8:00 p.m., he had heard gunshots in the area. When questioned closer about the gunshots, he fixed the time at around April 25 or 26, 1983.

At about that time, Zagorski showed up at the home of Rodney Bruce in Ironton, Ohio, driving Porter's Datson [sic] truck. He also had with him the deceased men's coveralls and Porter's .357 Magnum pistol. While in Ironton, Zagorski spent large sums of cash on survival gear, weapons, horses, a four-wheel drive pick-up, and a motorcycle. At one point he showed Bruce what he said was $25,000.00 in cash. He first claimed he had earned the money working off-shore and later said he had earned it working as a mercenary in South America. He also said he had made a "quick" $10,000.00 in Nashville. Zagorski also told Bruce and an army surplus dealer that he had lost his knife scabbard.

On May 26, 1983, Zagorski, armed and wearing a bullet-proof vest, was apprehended by Ohio law enforcement officers after a shoot-out in which Zagorski rammed a police car and shot a special deputy five times. Over $9,000.00 in cash was found in Zagorski's fatigue jacket and suit.

Zagorski gave different versions of his role in the killings of Dotson and Porter. When he spoke with police on June 1, 1983, he told them that he and another mercenary in their own vehicle had met Dotson and Porter near Spot. Two other mercenaries in a third vehicle had joined them as they drove up I-40. When they stopped on I-65 in Robertson County, the other mercenaries took Zagorski's rifle, silencer and gear and went into the woods with Dotson and Porter. Zagorski was instructed to drive Porter's pick-up to a Welcome Center at the Kentucky border and watch for law enforcement officers. Thirty to forty-five minutes later the other mercenaries met him, gave him $5,000.00 and Porter's .357 Magnum and returned his rifle and gear. Zagorski then left in Porter's pick-up since, he said, it was not unusual to trade cars in a drug deal.

In statements made on July 27 and August 1, 1983, Zagorski claimed he was hired to kill Porter but that Dotson's death was a mistake. He also said that two other men had been hired to kill Porter, that the deaths occurred in Humphreys County and that the bodies were

put in plastic bags and carried to Robertson County. Zagorski never admitted killing the men and refused to tell the identities of the other men he claimed were involved. Zagorski told some visitors at the jail that he had only been at the killings to "blow away" FBI agents.

The defense proof was directed toward showing that the killings did not occur in Robertson County. One witness, Ruby Winters, testified that at about 4:00 p.m. on April 23, 1983, she had heard loud music and four shots coming in a wooded area near Spot. Another witness testified as to how the HK 91 rifle fired and how far cartridges were expelled from the gun. This was in contradiction to testimony of state witnesses on the issue.

The jury found from the evidence that the defendant was guilty of murder in the first degree in killing John Dotson and Jimmy Porter. Implicit in the verdicts was a finding by the jury that the killings occurred in Robertson County, Tennessee. In a separate proceeding, and based upon the testimony introduced during the guilt phase of the trial, the jury imposed the sentence of death on the defendant for each killing on its finding (1) that the murders were committed by the defendant while he was engaged in committing robbery of the victims, (2) that the murders were especially heinous, atrocious or cruel in that they involved torture or depravity of mind, and (3) that there was no mitigating circumstance sufficiently substantial to outweigh the statutory aggravating circumstances found by the jury.

State v. Zagorski, 701 S.W.2d at 810-812.


## TESTIMONY AT POST-CONVICTION HEARING


At the post-conviction relief hearing, testimony was presented by Jeff Blum, an investigator; James E. Walton, one of Zagorski's trial attorneys; Larry D. Wilks, the other trial attorney; Ted Emery, Sheriff of Robertson County; and Ronnie Perry, a detective with the Robertson County Sheriff's Department.

Blum was an investigator in this post-conviction case. He conducted an investigation of petitioner's background. This included petitioner's early years and his relationship with his family. In substance, Blum found that petitioner had an unhappy childhood.

Blum also discovered that the petitioner had a prior conviction for receiving and concealing stolen property and prior drug convictions. In 1981, the petitioner had federal drug charges involving the transportation of drugs across state lines. The petitioner jumped bond on these charges. The petitioner had not been convicted of

5

any violent crimes.

James E. Walton, who was trial counsel for the petitioner, testified that he was appointed to this case. Up until 1982 or early 1983, he was active in criminal work, but had never handled a capital case before this one. At the time, Walton had been involved in 15 or 16 first degree murder trials and about 20-25% of his legal practice was related to criminal law.

Larry D. Wilks, co-counsel at trial, had very little criminal law experience. Because of his lack of experience, Wilks played a support role in the petitioner's case. Wilks had worked on one prior murder case.

Counsel requested that the trial court grant funds for a ballistics expert, but the motion was denied. Walton testified that a ballistics expert was sought because counsel did not think the location of the spent shells on the ground was consistent with the theory that the murders occurred where the bodies were found. The request was denied by the trial court. Counsel did secure the services of an Army officer who subsequently testified regarding the trajectory of the spent cartridges.

Counsel also asked for funds to hire an investigator because the events covered several states. This motion was also denied. This required counsel to investigate on their own. Counsels' investigation involved tracking down witnesses the state had given them. Counsel traveled to Centerville and the trout farm to interview witnesses. They also went to Ohio, Kentucky, and West Virginia, where the borders of the three states meet, to ascertain information about the petitioner's capture.

Trial counsel were granted funds for a psychiatrist. Trial counsel used these funds to hire Dr. Ben Bursten, a forensic psychiatrist. Dr. Bursten examined petitioner approximately one week before trial. After a phone conversation with Dr. Bursten, counsel decided not to call him as a witness. Dr. Bursten advised that there was nothing he could say on the stand that would help petitioner. Dr. Bursten indicated that he would have to testify that the petitioner could be a "mean person." The forensic evaluation of the petitioner by Middle Tennessee Mental Health Institute also found the petitioner competent to stand trial.

Counsels' primary trial objective was to undercut the state's theory and create

6

a reasonable doubt. Venue was one of the important issues. At trial, counsel for the petitioner called three witnesses relating to venue.

The petitioner was adamant that his attorneys not talk to nor involve his family. The petitioner insisted he was not the triggerman and did not want to be convicted of first degree murder. If he were convicted of first degree murder, however, the petitioner wanted the death penalty and not a life sentence. For this reason counsels' focus was aimed primarily at trying to prevent a first degree murder conviction. Petitioner emphatically instructed counsel not to involve his family, investigate his past, nor present any mitigating proof in the event of a sentencing hearing.

Because of their ethical concerns, counsel sought advice from the Board of Professional Responsibility. An advisory opinion was received by counsel which suggested that the client be fully advised that his desires are in conflict with counsel's ethical responsibilities. It was further suggested that counsel seek a ruling as to the client's competency to represent himself during that portion of the trial in which the conflict was imminent, and counsel should seek to withdraw during that portion of the trial.

In the end counsel determined that petitioner's wishes were paramount, and they should abide by his instructions. Accordingly, they did not develop extensive proof to present at a sentencing hearing in the event of a first degree murder conviction.

After the petitioner was convicted, counsel talked with the petitioner. Although the petitioner had told counsel not to argue or put on any mitigating proof, trial counsel convinced the petitioner to let them at least make an argument.

Before the sentencing hearing, there was a bench conference concerning requests for jury instructions. Counsel believed the trial court placed limitations on the mitigating factors that counsel was allowed to discuss during closing argument because the trial court denied their requests for jury instructions on specific mitigating factors. Consequently, counsel begged for mercy during closing arguments at the sentencing hearing.

7

Both attorneys testified that they had good relationships with the petitioner and met on a regular basis. Neither had any communication problems with the petitioner. The attorneys believed petitioner was competent and fully understood the ramifications of his decision in desiring the death penalty if convicted of first degree murder.

Sheriff Emery testified that as part of his investigation, he went to Louisiana, Michigan, Kentucky, Ohio and West Virginia. Defense counsel had access to the results of Sheriff Emery's investigation.

Sheriff Emery obtained a statement from the petitioner when petitioner was in a West Virginia hospital. Sheriff Emery found that the petitioner was alert and seemed to have no problem communicating with him. When the petitioner rode back to Tennessee with Sheriff Emery, petitioner did not complain about his health. When Sheriff Emery took a second statement on June 1, 1983, the petitioner was alert, he appeared normal, and his speech was not slurred. Sheriff Emery testified that, according to his investigation, no one else was involved in the murders.

Detective Perry testified that when the petitioner made a statement to him in the jail on July 27, 1983, the petitioner was coherent, spoke well, and could understand him. The petitioner did not appear to be under the influence of drugs or alcohol at the time. Nor did the petitioner make any complaints about his health at that time.

Detective Perry also testified that the petitioner was alert, able to speak and able to understand when he gave the statement on August 1, 1983. The petitioner did not appear to be under the influence of an intoxicant and never complained about his health or medical condition on that occasion. The petitioner only complained about being in jail.

## TRIAL COURT'S FINDINGS DENYING POST-CONVICTION RELIEF

The trial court filed a comprehensive Memorandum Opinion denying post-conviction relief. The trial court's rulings may be summarized as follows:

**A.**

8

The court found that the jury charge on "heinous, atrocious or cruel" had been litigated on direct appeal to the Tennessee Supreme Court. The trial court found that the Tennessee Supreme Court re-weighed the evidence and found no constitutional infirmity. State v. Zagorski, 701 S.W.2d 808, 814 (Tenn. 1985).

**B.**

The court found that trial counsel was not ineffective in the handling of the motion to suppress petitioner's statements. The court further noted that the issue was raised on direct appeal and decided adversely to petitioner. State v. Zagorski, 701 S.W.2d at 812.

**C.**

The court further concluded that trial counsel was not ineffective in their representation at the sentencing phase of trial. The court found that petitioner was competent to aid in his own defense and have input into trial determinations. The court found that counsel followed the dictates of their client's wishes. The court further found trial counsel was not ineffective in failing to argue the criminal activity of the victims, the petitioner's youth, or the petitioner's lack of a violent criminal history.

**D.**

The court ruled that the failure of the trial court to appoint various experts did not prejudice the petitioner. The court concluded that although a private investigator was not appointed to assist counsel, counsel conducted an extensive and appropriate investigation on their own. The court found no deficiency with regard to the investigation.

9

**E.**

The court found that certain information relating to the homicides was developed in other judicial districts and not turned over to the prosecuting District Attorney General. Although the court noted the need for the sharing of such information in multiple-jurisdiction cases, the court found that this information would not have altered the outcome of the trial.

## SCOPE OF REVIEW

In post-conviction proceedings, the petitioner must prove the allegations contained in his petition by a preponderance of the evidence. Davis v. State, 912 S.W.2d 689, 697 (Tenn. 1995); State v. Kerley, 820 S.W.2d 753, 755 (Tenn. Crim. App. 1991); Oliphant v. State, 806 S.W.2d 215, 218 (Tenn. Crim. App. 1991). Findings of fact and conclusions of law made by the trial court are given the weight of a jury verdict; this Court is bound by those findings unless the evidence contained in the record preponderates otherwise. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990); Teague v. State, 772 S.W.2d 932, 934 (Tenn. Crim. App. 1988). This Court may not reweigh or re-evaluate the evidence or substitute its inferences for those drawn by the trial court. Adkins v. State, 911 S.W.2d 334, 341 (Tenn. Crim. App. 1994). Questions concerning the credibility of witnesses and weight and value to be given their testimony are for resolution by the trial court. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

## HEINOUS, ATROCIOUS OR CRUEL

### A. Contentions of the Parties

The petitioner argues that the jury instruction on the "heinous, atrocious, or cruel" aggravating factor was unconstitutionally vague because the trial court failed to

include the definitions of the terms heinous, atrocious, cruel, torture, and depravity of mind. The petitioner claims that the jury instruction failed to narrow the class of death-eligible defendants as required by Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed. 2d 398 (1980).

In response, the state contends that because our Supreme Court on direct appeal construed and interpreted this aggravating circumstance in accordance with the definitions set forth in State v. Williams, 690 S.W.2d 517, 529-30 (Tenn. 1985), the "heinous, atrocious, or cruel" aggravating factor was not unconstitutionally vague as applied to the petitioner's case. The state further asserts that the Supreme Court's construction cured any constitutional defect that may have arisen from the fact that the jury was instructed only in the plain words of the statute.

## B. Compliance with Williams

In State v. Williams, our Supreme Court noted "that the court did not instruct the jury concerning the legal significance of the words 'heinous,' 'atrocious,' 'cruel,' 'torture,' or 'depravity of mind' as those terms are used in the aggravating circumstance defined in Tenn. Code Ann. § 39-2-203(I)(5)(1982). Williams, 690 S.W.2d at 532. After discussion of the legal meanings of these terms, the Court found insufficient evidence of "torture" (the victim had been killed first, mutilated second), but possible evidence of "depravity of mind" and left the final determination to the jury on remand. Id. at 525-532. The Court found the statute to be constitutional "so long as the abstract terms employed therein are construed and interpreted as we have done in this opinion and other opinions of this Court." Id. at 533.

In charging the jury in the present case, the trial court did not define any of the terms in the "heinous, atrocious, or cruel" aggravating circumstance. Instead, the trial court gave the following instruction:

> No death penalty shall be imposed unless you find unanimously that one or more of the following specified statutory aggravating circumstances has been proven on the trial and/or in the sentencing hearing beyond a reasonable doubt.
>
> The aggravating circumstances relied upon in this case are: the

11

murders were especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; the murders were committed while the defendant was engaged in committing robbery of the victims.

State v. Williams was released on May 20, 1985. Although the petitioner's trial was held before Williams was decided, the Supreme Court's opinion in his direct appeal was released six months after Williams. In finding that this aggravating factor was properly applied, the Supreme Court stated:

> On considering the evidence properly before the jury in this case, we are convinced that it is sufficient for a rational trial [sic] of fact to find beyond a reasonable doubt that the defendant killed John Dotson and Jimmy Porter in Robertson County during the course of a robbery. We are also of the opinion that the finding by the jury that the murders were "especially heinous, atrocious or cruel" is in accord with the evidence. See State v.Williams, 690 S.W.2d 517, 529-30 (Tenn. 1985). Although the victims died from gunshot wounds, the defendant also slit their throats, leaving them to bleed to death in the woods. This evidences depravity of mind and is a form of torture. Defendant's actions were an infliction of gratuitous violence, and needless mutilation of victims who were already helpless from fatal wounds which indicate a depraved state of mind at the time of the killings. We are also of the opinion that the evidence justifies the jury's finding that there was no mitigating circumstance which would outweigh the statutory aggravating circumstances found by the jury.

State v. Zagorski, 701 S.W.2d at 814.

The Tennessee Supreme Court decided many cases after Williams in which the definitions of these terms were not included in the instructions to the jury. In these cases, the Court upheld the use of this aggravator. Significantly, several of these cases, including the present case, were tried before Williams, but decided after. See e.g., State v. Barber, 753 S.W.2d 659, 668-69 (Tenn.), cert. denied, 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 236 (1988); State v. Duncan, 698 S.W.2d 63, 70-71 (Tenn. 1985), cert. denied, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986). It is also significant that the Supreme Court held in Williams that this aggravator was not unconstitutionally vague or overbroad. State v. Williams, 690 S.W.2d at 533; see also State v. Teel, 793 S.W.2d 236, 251 (Tenn.), cert. denied, 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990); State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989) (holding that the language "especially heinous, atrocious or cruel" requires, in addition, a finding of "torture or depravity of mind."), cert. denied, 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990).

12

In Strouth v. State, 755 S.W.2d 819 (Tenn. Crim. App. 1986), this Court cited the Supreme Court's opinion in the petitioner's direct appeal for the proposition that Williams was not to be applied retroactively:

> In State v. Zagorski, 701 S.W.2d 808 (Tenn.1985), decided six months after Williams, the defendant appealed the imposition of the death penalty based on the same two aggravating circumstances as in the instant case. Citing Williams, 690 S.W.2d at 529-530, but with no comment on the jury instructions, the Court agreed with the jury finding that the murders had been "especially heinous, atrocious or cruel." The defendant had slit the victims' throats after shooting them, and left them "to bleed to death in the woods. This evidence[d] depravity of mind and [was] a form of torture[,]...an infliction of gratuitous violence, and needless mutilation of victims who were already helpless." 701 S.W.2d at 814. The Court also rejected the defendant's contention that Tenn. Code Ann. § 39-2-203(i)(5) was unconstitutionally vague. Id. 701 S.W.2d at 816.

Id. at 831. The Court found that if the Supreme Court "found it unnecessary to give retroactive application of the Williams definitional jury instruction requirement in Zagorski, supra, we conclude that it is likewise unnecessary to do so in this case." Id.

Furthermore, the defective jury instruction was cured by the Tennessee Supreme Court in the direct appeal. If confronted by an improperly defined aggravating circumstance, the state appellate court may itself determine whether the evidence supports the existence of the aggravating circumstance as properly defined. Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). The Tennessee Supreme Court has utilized this method of review. State v. Duncan, 698 S.W.2d at 71. The Tennessee Supreme Court has also found harmless error when the trial court erroneously omitted "depravity of mind" as a part of this aggravating circumstance. State v. Bush, ___ S.W.2d ___ (Tenn. 1997). The court concluded that had the jury been properly instructed, it would have found "depravity of mind." Id. Petitioner's contention that his "liberty interest in jury sentencing" precludes a Tennessee appellate court reweighing an aggravating circumstance is without merit.

Because the Tennessee Supreme Court reviewed the petitioner's direct appeal after the release of its opinion in Williams, and because the Court cited Williams in approving the jury's finding that the murders were heinous, atrocious, or cruel, this Court is bound by our Supreme Court's decision on this issue. See Caruthers v. State, 814 S.W.2d 64, 70 (Tenn. Crim. App. 1991); Harvey v. State, 749 S.W.2d 478, 479

(Tenn. Crim. App. 1987); see also Tenn. Code Ann. § 40-30-112(a)(1982)("[a] ground for relief is considered 'previously determined' if a court of competent jurisdiction has ruled on the merits after a full and fair hearing.").

### C. Houston Distinguishable

In Houston v. Dutton, 50 F.3d 381, 387 (6th Cir.), cert. denied, 116 S.Ct. 272 (1995), the federal appellate court held that the same jury instruction as given in this case was constitutionally infirm. The case is distinguishable. Our Supreme Court decided Houston v. State, 593 S.W.2d 267 (Tenn.) , cert. denied, 449 U.S. 891, 101 S.Ct. 251, 66 L.Ed.2d 117 (1980), prior to its decision in Williams. Therefore, the Supreme Court did not apply the subsequent limiting construction of the "heinous, atrocious, or cruel" aggravating circumstance as it did in the petitioner's direct appeal.

In summary, while the jury instruction on this aggravating circumstance was deficient without the limiting definitions of the relevant terms, this Court must presume that our Supreme Court cured any constitutional defect by applying a narrowing construction pursuant to Williams, which was cited in the Supreme Court's opinion. See State v. Zagorski, 701 S.W.2d at 814. This issue is without merit.

### INEFFECTIVE COUNSEL - MOTION TO SUPPRESS STATEMENTS

### A. Contentions of the Parties

The petitioner contends that trial counsel failed to adequately investigate facts relating to the statements he made to the police and failed to present important evidence regarding the circumstances of the petitioner's statements. Specifically, the petitioner argues that trial counsel failed to present proof regarding his state of mind, his medical condition, the medications he was taking, the effect of his medical conditions and taking of medications, and the circumstances of his incarceration. If trial counsel had presented this proof at the suppression hearing, the petitioner asserts

14

that the trial court would have found that the petitioner's statements were involuntary and subject to suppression.

In response, the state argues the post-conviction court properly held that trial counsel litigated the jail conditions, the petitioner's mental and physical state, and the voluntariness of the petitioner's statements. The state further argues that the petitioner has failed to demonstrate any prejudice from the introduction of these statements because the Supreme Court held on direct appeal that if the statements were admitted in error, the error was harmless beyond a reasonable doubt in view of the overwhelming evidence of the petitioner's guilt.

## B. Standards of Review

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). There must be a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Id. at 694, 104 S.Ct. at 2068; Best v. State, 708 S.W.2d 421, 422 (Tenn. Crim. App. 1985). Should the petitioner fail to establish either factor, he is not entitled to relief.

When determining whether counsel's performance was deficient, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. 2065. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). We must defer to trial strategy and tactical choices when they are informed ones based upon adequate preparation. Id.

15

Moreover, on appeal, the findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991); Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the petitioner to show that the evidence preponderates against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978), cert. denied, 441 U.S. 947, 99 S.Ct. 2170, 60 L.Ed.2d 1050 (1979).

### C. Our Determinations

A pre-trial hearing was held on the motion to suppress the petitioner's statements given on May 28, June 1, July 27, and August 1, 1983. At the hearing, the state indicated that it would not attempt to introduce the first statement in its case-in-chief.

The last three statements were taken after the petitioner had been moved to the Robertson County Jail. Although trial counsel argued and cross-examined the state's witnesses concerning the petitioner's medical condition, his mental condition, and the conditions of his jail cell, trial counsel did not present any medical records or other proof. At the end of the hearing, the trial court denied the motion to suppress the petitioner's statements.

As argued by the petitioner, the mental condition of a defendant is a significant factor in determining whether a statement was given voluntarily. See State v. Brimmer, 876 S.W.2d 75, 79 (Tenn. 1994). Whether trial counsel was deficient in not introducing medical records need not be decided since petitioner is unable to show prejudice. Our Supreme Court determined on direct appeal that any error in admitting the statements was harmless error in view of the overwhelming evidence of guilt. State v. Zagorski, 701 S.W.2d at 812. In order for the petitioner to succeed on an ineffective assistance of counsel claim, there must be a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. at 694, 104 S.Ct. at 2068; Best v. State, 708 S.W.2d at 422.

16

This question has been answered by our Supreme Court. This issue is without merit.

## INEFFECTIVE COUNSEL - SENTENCING HEARING

### A. Contentions of the Parties

The petitioner asserts that trial counsel was ineffective by (1) failing to investigate and present mitigating proof at the sentencing phase of trial, (2) failing to fully inform the petitioner of possible mitigating factors and the consequences of his decision not to introduce mitigating evidence at sentencing, (3) failing to seek a competency hearing because of the petitioner's clouded judgment, (4) failing to follow the guidelines specified in the Advisory Ethics Opinion which counsel solicited, and (5) failing to make an argument of available mitigating factors.

In response, the state argues that the post-conviction court properly found that counsel was not ineffective for abiding by the petitioner's request that counsel not investigate or present mitigating proof at the sentencing hearing. Moreover, the state submits that counsel was not bound to follow the recommendations in the Advisory Ethics Opinion. Finally, the state argues that even if counsel was ineffective by failing to investigate and present mitigating proof, the petitioner has failed to show prejudice.

### B. General Duties of Counsel

In death penalty cases, the sentencer may not be precluded from considering any aspect of a defendant's character or record as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978) (plurality opinion); see also Johnson v. Texas, 509 U.S. 350, 361, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290, reh'g denied, 509 U.S. 941, 114 S.Ct. 15, 125 L.Ed.2d 767 (1993). The United States Supreme Court has held that mitigating evidence is relevant to sentencing hearings and should be heard. See California v. Brown, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987); Eddings v. Oklahoma, 455

17

U.S. 104, 113-15, 102 S.Ct. 869, 876-77, 71 L.Ed.2d 1 (1982). However, there is no legal requirement and no established practice that the accused must offer evidence at the penalty phase of a capital trial. State v. Melson, 772 S.W.2d 417, 421 (Tenn.), cert. denied, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989); see also Darden v. Wainwright, 477 U.S. 168, 184-85, 106 S.Ct. 2464, 2473, 91 L.Ed.2d 144 (1986). In fact, counsel has properly seen fit not to offer any evidence at the penalty phase in many death penalty cases. State v. Melson, 772 S.W.2d at 421 (citing sixteen cases heard by the Tennessee Supreme Court including petitioner's case).

The extent of investigation required depends critically upon information supplied by the defendant. Burger v. Kemp, 483 U.S. 776, 795, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987); see also Whitmore v. Lockhart, 8 F.3d 614, 621 (8th Cir.1993). When a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. Burger, 483 U.S. at 795, 107 S.Ct. at 3126.

Our Supreme Court recently addressed the duty of counsel to investigate and present mitigating evidence in Goad v. State, 938 S.W.2d 363 (Tenn. 1996). In Goad, the Court found trial counsel ineffective for failing to present mitigating evidence relative to Goad's symptoms of post-traumatic stress disorder. The Court further found that Goad was prejudiced by counsel's failure to present such proof. In determining whether Goad was prejudiced by counsel's deficient representation, the Court set forth several factors to consider:

> Where the alleged prejudice under Strickland involves counsel's failure to present mitigating evidence in the penalty phase of a capital trial, several factors are significant. First, courts have analyzed the nature and extent of the mitigating evidence that was available but not presented. Deutscher v. Whitley, 946 F.2d 1443 (9th Cir. 1991); Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988); Cooper v. State, 847 S.W.2d at 532; Atkins v. State, 911 S.W.2d 334 (Tenn. Crim. App. 1995). Second, courts have considered whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Atkins v. Singletary, 965 F.2d 952 (11th Cir. 1992); Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990); State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989). Finally, the courts have considered whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. Fitzgerald v. Thompson, 943 F.2d 463, 470 (4th Cir. 1991); Elledge v.

18

Dugger, 823 F.2d 1439 (11th Cir. 1987).

Id. at 371.

## C. Attorney - Client Relationship

A crucial issue relating to counsel's performance is the effect, if any, of defendant's emphatic instructions not to prepare for or present mitigating proof in the sentencing phase of the trial. This appears to be an issue of first impression in Tennessee.

At the heart of the issue is whether counsel should totally disregard the client's desires as to how the defense should be conducted. Obviously, there are times when counsel should not follow the demands of the client. For example, a lawyer should not fabricate evidence at the request of the client. This is clearly illegal and unethical conduct. See Tenn. Code Ann. § 39-16-503; Sup. Ct. Rules, Rule 8, Code of Prof. Resp., DR 7-102(6). However, a client's request not to present certain kinds of proof would not necessarily result in counsel's committing a crime or unethical conduct.

A criminal prosecution is directed against the defendant, not counsel. It is in fact the defendant's case, not counsel's. The purpose of a defense lawyer is to assist a defendant in making a defense and to represent the defendant before the court. State v. Franklin, 714 S.W.2d 252, 262 (Tenn. 1986). Although a client may conduct his or her own defense ultimately to his or her detriment, that choice must be honored out of "that respect for the individual which is the lifeblood of the law." Faretta v. California, 422 U.S. 806, 834, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975). Furthermore, the authority to make decisions generally belongs to the client and, if made within the framework of the law, such decisions are binding on counsel. Sup. Ct. Rules, Rule 8, Code of Prof. Resp., EC 7-7.

Other jurisdictions have confronted the issue of a defendant's right to direct how a defense should be conducted. In State v. Ali, 329 N.C. 394, 407 S.E.2d 183 (1991), the court found no constitutional violation when counsel complied with the wishes of the defendant in accepting a juror when counsel suggested otherwise. The court

found that the attorney-client relationship is one based upon principles of agency as opposed to guardian and ward. Ali, 407 S.E.2d at 189; see also People v. Wilkerson, 123 Ill.App.3d 527, 463 N.E.2d 139 (1984).

We likewise find that the attorney-client relationship is primarily one of agency. When a competent defendant knowingly and voluntarily chooses a lawful course of conduct, counsel is ordinarily bound by that decision. If the defense is prejudiced because of a defendant's choice, a defendant should not later be heard to complain as to the course the defendant chose. Dukes v. State, 578 S.W.2d 659 (Tenn. Crim. App. 1978); State ex rel. Lea v. Brown, 166 Tenn. 669, 64 S.W.2d 841 (1933).

Having concluded that counsel is ordinarily bound by the lawful choices of the client, we now turn to the specific allegations of ineffective assistance of counsel.

### D. Failure to Investigate Mitigating Proof

Counsel was hampered in their efforts to do a pre-trial investigation in preparation of presenting mitigating evidence during a potential sentencing phase of the trial. This was primarily because of petitioner's adamant instructions not to involve his family nor present mitigating evidence in the event of a first degree murder conviction.

Petitioner contends that trial counsel would have discovered the following information if they had conducted an adequate investigation for the sentencing phase of trial:

> Zagorski was born and raised in Tecumseh, Michigan, a small town outside Detroit. Zagorski's mother and father were both of Polish descent. Zagorski's mother had only a seventh grade education and had suffered a brain injury when she was one and a half years old. She apparently suffered brain damage and was very difficult to deal with in a lot of different ways.
>
> Zagorski's father worked in a low level job at Tecumseh Engines. The family never owned a car, and they had a small house in Tecumseh. They were a lower income family. Zagorski had few if any friends growing up. Zagorski's mother was very immature and mistreated Zagorski. Zagorski's father spent little time with him. Growing up, Zagorski developed a stutter and was embarrassed to speak outside the home.

> Zagorski is illiterate, having never learned to read or write. Zagorski had a learning disability. Zagorski never received any type of tutors or corrective classes growing up. Zagorski was a very poor student, never graduated from high school and was continuously absent. Zagorski became involved with alcohol and drugs at a very early age.

The failure to fully investigate a defendant's background in preparation for a possible death penalty sentencing hearing is ordinarily below the range of competence demanded of counsel. See California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed. 2d 934 (1987); Goad v. State, 938 S.W.2d 363 (Tenn. 1996). However, in this case the petitioner had explicitly instructed counsel not to confer with his family and not to oppose the death penalty. Nevertheless, counsel did confer with petitioner's mother. Furthermore, counsel had secured the services of Dr. Bursten, a forensic psychiatrist. As a result of Dr. Bursten's examination of petitioner approximately one week before trial, Dr. Bursten told counsel he could not help by testifying and would have to testify that petitioner could be a "mean person." The decision not to use such testimony is certainly understandable and a strategic choice. Cooper v. State, 847 S.W.2d at 528.

Most importantly, we need not reach the issue of whether trial counsel was deficient in failing to fully investigate defendant's background if the petitioner does not make a sufficient showing of prejudice. Strickland v. Washington, 466 U.S. at 697, 104 S.Ct. at 2069; Felde v. Butler, 817 F.2d 281 (5th Cir. 1987). There were two murders. The jury found two aggravating circumstances in support of the death penalty; namely, (1) the murders were committed during the perpetration of robbery, and (2) the murders were especially heinous, atrocious or cruel in that they involved torture or depravity of mind. Petitioner has failed to establish prejudice for two reasons. Firstly, there is no showing that petitioner would have allowed the introduction of such evidence even if it were available. Petitioner was always insistent not to involve his family. There is nothing in the record to indicate anything to the contrary. Secondly, petitioner has not shown a reasonable probability of a different result had the evidence been introduced. While many people have unhappy childhoods, few commit brutal murders. Strouth v. State, 755 S.W.2d at 827. Considering the nature of the background information as compared to the strong aggravating factors, petitioner has failed to show prejudice. Strickland, 466 U.S. at

21

697, 104 S.Ct. at 2069; Goad, 938 S.W.2d at 371.

## E. Failure to Present Mitigating Proof

Closely related to the alleged failure to investigate mitigating evidence is petitioner's allegation that counsel was ineffective due to their failure to present any mitigating evidence during the sentencing phase of the trial. As a general rule the failure to present relevant mitigating evidence would constitute a deficient performance by counsel. See Goad v. State, 938 S.W.2d at 371. However, the failure to introduce mitigating evidence does not necessarily indicate ineffective assistance of counsel. Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); State v. Melson, 772 S.W.2d 417 (Tenn.1989).

In this instance trial counsel was faced with adamant instructions from a competent client not to present mitigating evidence. In view of counsel's explanations to petitioner of the ramifications of his decision, the competence of the petitioner and his knowing and voluntary request that no mitigating proof be presented, counsel was not deficient in following petitioner's request. It is not outside the range of competent attorney actions to fail to present mitigating evidence when the defendant adamantly endorses that position. Linda E. Carter, *Maintaining Systemic Integrity In Capital Cases: The Use of Court-Appointed Counsel to Present Mitigating Evidence When the Defendant Advocates Death,* 55 TENN. L. REV. 95, 140 (1987). To satisfy the Constitution, counsel must function as an advocate for the defendant, as opposed to a mere friend of the court. United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

The United States Supreme Court has recognized the right of a mentally competent defendant to forego appellate review. Demosthenes v. Baal, 495 U.S. 731, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990); Whitmore v. Arkansas, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); Gilmore v. Utah, 429 U.S. 1012, 97 S.Ct. 436, 50

L.Ed.2d 632 (1976). If a competent defendant is able to waive the right of appellate review of a death sentence, we see no reason why a competent defendant may not also waive the right to present mitigating evidence. Singleton v. Lockhart, 962 F.2d 1315, 1322 (8th Cir. 1992). Counsel is not ineffective at the sentencing phase of a capital murder trial when counsel follows the defendant's request not to fight the death penalty. Autry v. McKaskle, 727 F.2d 358 (5th Cir. 1984); Clark v. State, 613 So.2d 412 (Fla. 1992), cert. denied 114 S.Ct. 114 (1993).

The post-conviction court found that the petitioner was competent when he made the request to counsel not to present mitigating proof. The evidence does not preponderate against this finding. In light of petitioner's knowing and voluntary request that counsel not present any mitigating proof, we find counsel was not ineffective by failing to present mitigating proof. Singleton v. Lockhart, 962 F.2d at 1322.

Furthermore, as previously stated, petitioner has not shown prejudice. Strickland v. Washington, 466 U.S. at 697, 104 S.Ct. at 2069; Goad v. State, 938 S.W.2d at 371. There has not been a showing of a reasonable probability that the suggested mitigating circumstances would have altered the outcome of the proceeding. Strickland, 466 U.S. at 699-700.

### F. Informing Client of Consequences of Actions

Petitioner next contends he was not adequately informed as to mitigation proof. Certainly, a meaningful discussion with the client is the "cornerstone of effective assistance of counsel." Martin v. Maggio, 711 F.2d 1273, 1280 (5th Cir. 1983) (citing Gaines v. Hopper, 575 F.2d 1147, 1149-50 (5th Cir. 1978)). However, the record does not support petitioner's contention. Petitioner was properly advised by counsel at all stages of the proceedings. Petitioner understood the ramifications of his actions. This issue is without merit.

### G. Failure to Request Competency Hearing

23

Petitioner contends counsel was deficient in failing to request a competency hearing regarding his decision to forego mitigating proof. Petitioner had been found competent by Middle Tennessee Mental Health Institute. He was also found to be competent by Dr. Bursten, the psychiatrist retained by petitioner's counsel. Dr. Bursten's findings were based upon an examination approximately one week before trial. Counsel had no problem communicating with petitioner. In short, there is no showing that a competency hearing would have led to a contrary finding. Counsel was not deficient in failing to seek a further competency hearing, nor has any prejudice been demonstrated. Felde v. Butler, 817 F.2d at 283.

## H. Failure to Follow Advisory Ethics Opinion

Petitioner argues trial counsel was ineffective for failing to follow the suggestions of an Advisory Ethics Opinion.

Being concerned about the petitioner's request that they not present any mitigating proof or argue for a life sentence at the sentencing hearing, trial counsel secured an advisory opinion. Advisory Ethics Opinion 84-A-255 stated that although counsel's beliefs and duties must yield to the beliefs and rights of the client, counsel was not required to advocate the legal choices on behalf of the client. Yet, the opinion stated "[c]ounsel is ethically obligated to follow the law and to do nothing in opposition to the client's moral and legal choices." The opinion concluded:

> Counsel should fully inform the accused of his legal rights to conduct a defense of his choice as guaranteed by the Constitution. The accused should be fully advised by counsel that his rights and interests are in conflict with counsel's moral beliefs and ethical responsibilities. In [the] event the accused maintains his instance [sic] on no actions or arguments on his behalf against the death penalty being imposed, then counsel should advise the accused that a motion to withdraw from those portions of the trial will be filed with the court. The consequences of this action should be fully explained to the accused. The court should be fully informed of the conflicts between counsel and the accused. Counsel should seek an adjudication that the accused is competent to represent himself during the voir dire examination of prospective jurors and the penalty stages of the trial or any other portion of the trial where the conflict is imminent. Counsel should move the court to withdraw form [sic] representation during the portion of the trial where the conflict is manifested.

Trial counsel believed that petitioner was aware of the seriousness of the

proceedings and appreciated the ramifications of his decision. The evidence supports the trial court's findings that petitioner was competent to stand trial, aid in his defense and to have input into the decision making process. There is nothing in the record to suggest otherwise.

Counsel chose not to move the court for permission to withdraw during the penalty phase. They felt obligated to represent petitioner rather than abandoning him. Although petitioner did not want counsel to do anything, they were able to convince him to allow them to make an argument on his behalf. Neither the state nor the petitioner put on any proof at the sentencing hearing.

We do not find that the failure of counsel to move to withdraw from representation was ineffective assistance of counsel. Petitioner had agreed to allow counsel to make a closing argument. Counsel followed the lawful directives of a competent client. A request to withdraw would have been to the detriment of petitioner. Counsel acted within the range of competence demanded of attorneys in criminal practice. Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975). This issue is without merit.

## I. Final Argument

Petitioner argues that trial counsel should have argued to the jury the victims' criminal activity of selling drugs, the petitioner's youth, and petitioner's lack of a violent criminal history. The post-conviction court found that counsel was not ineffective for failing to argue these mitigating circumstances. Specifically, the post-conviction court found that the jury already knew that the case revolved around a drug deal and that the petitioner's age (27 or 28 years old) would have been unlikely to have any effect upon the jury. The court further found that if counsel had opened the door with the petitioner's nonviolent criminal history, the state would have countered with a damaging videotape of the petitioner during an interview with the media in Ohio. In that videotape the petitioner apparently indicated he did not care about the family of

25

the special deputy he shot at the time of his capture. Since the evidence does not preponderate against the findings of the trial court, petitioner has not shown that the results of the proceedings would have been any different if counsel had argued these factors. Strickland v. Washington, 466 U.S. at 694, 104 S.Ct. at 2068.

The trial court denied trial counsel's request that it instruct the jury that they could consider as mitigating circumstances the victims' participation in a drug transaction, the petitioner's lack of a prior record of violent criminal activity, and the petitioner's youth. At the same time, the trial court ruled:

> I'm going to give the defense great leeway as to whether or not they would go far afield. You would feel free to object. It would not be discourteous, and I'd rule on it at that time, but I do not want to limit them in their argument in a case like this.

Trial counsel believed that because the trial court was not going to charge the jury on the mitigating factors, trial counsel could not argue them to the jury. Therefore, trial counsel's final argument was basically a plea for mercy. Under the circumstances the plea for mercy did not constitute ineffective assistance of counsel. See Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed. 2d 144 (1986).

## DENIAL OF FUNDS FOR EXPERTS

### A. Contentions of the Parties

The petitioner contends that the trial court denied him effective assistance of counsel by denying his motion requesting funds for a private investigator and a ballistics expert. The petitioner further contends that counsel was ineffective by failing to request a pathologist, criminologist, medical experts and/or a forensic expert. It is the petitioner's contention that experts and investigators would have insured that an adequate record was developed on the issues presented to, and decided by, the jury.

The state responds that complaints about the trial court's denial of expert funds should have been raised in an interlocutory appeal or on direct appeal, and thus, the

issue is waived. Regardless, the state argues that the petitioner has failed to show how he was prejudiced by the trial court's rulings. As to counsel's failure to request additional experts, the state submits that counsel requested the appropriate expert services and would not have prevailed in further requests. Moreover, the state submits that the petitioner has failed to demonstrate that this failure resulted in any prejudice.

## B. Need for Expert Services

The decision of whether to authorize investigative or expert services lies within the sound discretion of the trial court. See State v. Cazes, 875 S.W.2d 253, 261 (Tenn.1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995); State v. O'Guinn, 709 S.W.2d 561, 568 (Tenn.) cert. denied, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986). The right to these services exists only upon a showing of a particularized need. State v. Shepherd, 902 S.W.2d 895, 904 (Tenn.1995); State v. Black, 815 S.W.2d 166, 179-80 (Tenn.1991). "The defendant must show that a substantial need exists requiring the assistance of state paid supporting services and that his defense cannot be fully developed without such professional assistance." State v. Evans, 838 S.W.2d 185, 192 (Tenn.1992), cert. denied, 510 U.S. 1064, 114 S.Ct. 740, 126 L.Ed.2d 702 (1994).

## C. Facts

In the present case, trial counsel requested funds to hire a psychiatrist, a ballistics expert, and a private investigator. The trial court granted funds for a psychiatrist but denied the other requests. The ballistics expert was requested because the defense wanted to show that the location of the spent cartridges was inconsistent with the victims being killed in Robertson County. After the request for a ballistics expert was denied, trial counsel went to Fort Campbell, Kentucky, and asked Colonel John Oliver to run tests as to the trajectory of the spent shells. Col. Oliver did

27

so and testified at trial that the weapon would not have ejected the shells in the pattern demonstrated by the state's proof.

When the trial court denied their motion for an investigator, trial counsel did their own investigation based on the discovery provided by the state. This included information provided by Sheriff Emery, who traveled to several states gathering information. Moreover, at the post-conviction hearing, counsel testified that while it was a hardship, they did travel to the tri-state area where the petitioner had been captured. They also traveled to Hickman County and interviewed witnesses in furtherance of their investigation.

### D. Waiver and Prejudice

We first note that the issue relating to the private investigator and ballistics expert was not raised on direct appeal. Accordingly, this issue is waived pursuant to Tenn. Code Ann. § 40-30-112(b)(1); see also House v. State, 911 S.W.2d 705 (Tenn. 1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1685, 134 L.Ed.2d 787 (1996).

Furthermore, petitioner has demonstrated no prejudice as a result of the denial of funds for the various expert witnesses. No experts testified at the post-conviction hearing. Without such evidence we are left to speculate as to whether such expert proof would have been beneficial to petitioner. Davis v. State, 912 S.W.2d 689, 698 (Tenn. 1995). Specifically, there is no showing as to what the testimony of a ballistics expert, pathologist, criminologist, medical expert and/or forensic expert would be. There is also no showing as to what significant information a private investigator would have discovered that was not known by defense counsel as a result of their own investigation.

This issue is without merit.

### WITHHOLDING EXCULPATORY EVIDENCE

### A. Contentions of the Parties

The petitioner contends that the state failed to provide potentially exculpatory evidence to the defense in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The petitioner contends that trial counsel was hampered by the prosecution's failure to hand over certain reports with the names of other persons who might have knowledge of the murders.

The state argues that the post-conviction court properly held that the petitioner failed to demonstrate that this evidence would have created a reasonable probability of a different result at his trial. The state further submits that since one of the documents was not given to the prosecuting office until eight years after the trial, the post-conviction court properly held that the document was not known to the prosecution at the time of trial.

## B. Brady v. Maryland

In Brady v. Maryland, the United States Supreme Court held that any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196-97. The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. State v. Marshall, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992); Branch v. State, 4 Tenn. Crim. App. 164, 168, 469 S.W.2d 533, 536 (1969). In United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985), the Supreme Court held that both exculpatory and impeachment evidence fall under the Brady rule.

Before an accused is entitled to relief under this theory, he must establish several prerequisites: (a) the prosecution must have suppressed the evidence; (b) the evidence suppressed must have been favorable to the accused; and (c) the evidence must have been material. See United States v. Bagley, 473 U.S. at 674-75, 105 S. Ct. at 3379-80; Brady v. Maryland, 373 U.S. at 87, 83 S. Ct. at 1196-97; State v. Edgin,

29

902 S.W.2d 387, 390 (Tenn. 1995). Evidence is considered material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); State v. Edgin, 902 S.W.2d at 390.

## C. The Exculpatory Documents

At the post-conviction hearing, the petitioner presented two documents that were not provided to defense counsel before trial. The first document is an investigative report prepared by Jeff Long, an investigator for the District Attorney's office in the Seventeenth Judicial Circuit. The report contains names of various individuals with possible knowledge of the murders in this case, and those names were not provided to the petitioner's counsel. According to the cover letter dated September 1, 1983, this investigative report was sent to District Attorney General Lawrence Ray Whitley of the Ninth Judicial Circuit, the prosecutor in this case.

The second document is a letter dated September 29, 1983, to Investigator Jeff Long in the Seventeenth Judicial Circuit from an assistant district attorney in the Twenty-first Judicial Circuit. The letter stated that the father of a local resident had been contacted by individuals in Texas and was "offered the job of killing someone, for a substantial sum of money." The local resident indicated that her father turned the job down; however, she felt certain that it was "the Jimmy Porter - Dale Dotson circumstance." This letter was retained in the files in the Seventeenth Judicial Circuit and not given to the prosecuting District Attorney's office in the Ninth Judicial Circuit until years after the trial.

In denying relief, the post-conviction court found that these materials would not have altered the outcome of the case.

## D. Ruling

Certainly, it is regrettable that defense counsel was unaware of these

documents. As stated in petitioner's brief, these documents "contained names as well as other information which would have been useful to Zagorski's trial counsel in investigating the murders." However, the crucial issue is whether these documents are "favorable" and "material." United States v. Bagley, 473 U.S. at 674-75, 105 S.Ct. at 3379-80. There was no testimony at the post-conviction hearing that these documents led or would have led to "favorable" information. See Foster v. State, ___ S.W.2d __ (Tenn. Crim. App. 1996). Furthermore, in order for petitioner to get relief there must be a reasonable probability that, had this evidence been disclosed to the defense, the result of the proceeding would have been different. State v. Edgin, 902 S.W.2d at 390. The evidence does not preponderate against the trial court's finding that this material would not have affected the outcome of the trial. In short, there is no showing that the failure to disclose this information "undermines confidence in the outcome of the trial." Kyles, 514 U.S. at ___, 115 S.Ct. at 1566; Edgin, 902 S.W.2d at 390.

The burden is on the petitioner to prove a constitutional violation by a preponderance of the evidence. Edgin, 902 S.W.2d at 389; State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993). This he has failed to do.

This issue is without merit.


## CONCLUSION


We find no reversible error; therefore, the judgment of the trial court is AFFIRMED.

                                                           _____
                                                           JOE G. RILEY, JUDGE

CONCUR:

_____
JOHN H. PEAY, JUDGE


_____
JOSEPH M. TIPTON, JUDGE